Alexander von Brandenfels,
1338 York St, San Francisco, CA, 94110
Tel.: (302) 648-6020
Fax: n/a
Email: a.von.brandenfels@gmail.com
Plaintiff in pro per

**FILED**

JAN 21 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| Alexander von Brandenfels,<br>    Plaintiff in Pro Per,<br><br>v.<br><br>Roomster Corp.;<br>John S. Shriber;<br>Roman Zaks;<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.:

**C 20 00411**

**SVK**

# COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF UNDER THE TELEPHONE CONSUMER PROTECTION ACT AND THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
# DEMAND FOR JURY TRIAL

Complaint: Brandenfels v. Roomster Corp.                                        1

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

1.    The Court has jurisdiction under 28 U.S.C. §1331 because this complaint

      arises under laws of the United States.

2.    Venue is proper because Defendant Roomster does business in and solicits

      consumers in this district, and because a substantial part of the events giving

      rise to these claims occurred here.

3.    According to Local Rule 3-2 (c), this lawsuit should be assigned to the San

      Jose Division of this court, since a substantial part of the events giving rise

      to these claims occurred in Santa Clara County.

### PARTIES

4.    Alexander von Brandenfels is a natural person and resident of San

      Francisco, California.

5.    Roomster Corp. ("Roomster") is a privately-owned corporation,

      incorporated in New York, with its headquarters in New York. Roomster

      conducts business throughout the entire United States. Roomster's address

for service of process is: 285 W BROADWAY STE 320 NEW YORK, NEW YORK, 10013.

6.     John S. Shriber is a natural person, and is a co-founder and the Chief Executive Officer of Roomster.

7.     Roman Zaks is a natural person, and is a co-founder and the Chief Technology Officer of Roomster.

## THE TELEPHONE CONSUMER PROTECTION ACT, REGULATIONS IMPLEMENTING IT, AND RELATED CASE LAW

8.     The Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.* (1991), is a law regulating telemarketing and the use of auto-dialing technology. It was enacted in response to increasing abuse of consumers' telephone systems by businesses.

9.     The TCPA offers two private rights of action (47 U.S.C. § 227 (b) (3) and 47 U.S.C. § 227 (c) (5)) to people who receive communications in violation of the statute. Each one allows recovery of $500 per violation of its respective subsection, which the court may triple if the violations were knowing or

willful. In addition to these damages, plaintiffs may seek an injunction to stop future violations.

10.     Recovering damages under both 47 U.S.C. § 227 (b) (3) and 47 U.S.C. § 227 (c) (5) for the same text message is permitted. See e.g. Drew v. Lexington Consumer Advocacy, LLC, Case No. 16-cv-00200-SBA, Doc. No. 24 at *23 (N.D. Cal. Apr. 18, 2016), where the Court found that plaintiff could "recover statutory damages for the § 227(b) and § 227(c) violations even though these violations arise from the same telephone contact".

11.     The FCC has declared that restrictions on placing "calls" to phones also apply to sending text messages. *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd 14014, 14115, para. 165 (2003).

12.     Courts in several different jurisdictions have found that individuals acting on behalf of business entities can be held personally liable for violations of the TCPA if they personally participated in or authorized those violations. See e.g.:

- *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892 (W.D. Tex. 2001): "if the officer directly participated in or authorized the statutory violation, even though acting on behalf of the corporation, he may be personally liable".

- *Jackson's Five Star Catering, Inc. v. Beason, et al*, No. 10-10010 - Document 64 (E.D. Mich. 2013): "many courts have held that corporate actors can be individually liable for violating the TCPA. … Where courts have declined to find personal liability, there has been little evidence of the corporate officer's direct participation in the wrongdoing."

- *Maryland v. Universal Elections*, 787 F. Supp. 2d 408 (D. Maryland 2011): "if an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force."

- *Mora v. Zeta Interactive Corp.*, No. 1:16-cv-00198-DAD-SAB - Doc. No. 17 (E.D. Cal. 2016) (concurring with the three above cases).

## THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, AND RELATED STATUTES AND CASE LAW

13.   18 U.S.C. §§ 1961–1968 ("the Racketeer Influenced and Corrupt Organizations Act" or "RICO") (1970) creates criminal and civil liability for people who participate in certain kinds of racketeering activity.

14.   Under 18 U.S. Code § 1343 ("Fraud by wire, radio, or television") (1952), it is unlawful for one who has "devised … any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" to "transmit … by means of wire … communication in interstate or foreign commerce, any writings … for the purpose of executing such scheme or artifice".

15.   Under 18 U.S. Code § 1961 (1), a violation of 18 U.S. Code § 1343 (wire fraud) may constitute "racketeering activity" for the purposes of RICO.

16.   18 U.S. Code § 1962 lists the activities that are prohibited under the RICO Act. Most notably, 18 U.S. Code § 1962 (a) makes it unlawful to invest income derived from racketeering activity into an enterprise, and 18 U.S. Code § 1962 (c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect,

interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity".

17.   18 U.S. Code § 1964 (c) states that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor … and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee".

18.   To determine what qualifies as "property" for the purposes of a RICO injury, courts have typically looked to state law, often citing *Doe v. Roe*, 958 F.2d 763 (7th Cir.1992) ("While federal law governs most issues under RICO, whether a particular interest amounts to property is quintessentially a question of state law."). See e.g. *Diaz v. Gates*, 420 F.3d 897 (9th Cir.2005) (en banc), cert. denied, 546 U.S. 1131 (2006).

19.   Cal. Civ. Code §§ 654 and 655 define "property" as "the thing of which there may be ownership", and provide that "[t]here may be ownership … of rights created or granted by statute". Thus, rights created or granted by statute are property in California.

Complaint: Brandenfels v. Roomster Corp.                                              7

## FACTUAL ALLEGATIONS: ROOMSTER

20.   Defendant Roomster makes a web application called Roomster, which purportedly allows people to view listings of rooms for rent in their area.

21.   Roomster's main source of revenue is from charging its users membership fees.

22.   Roomster's membership fee in the United States is most recently $9.99 per week.

23.   Roomster acquires many of its members via an affiliate marketing program, where "affiliates" or "affiliate marketers" refer potential customers to Roomster via advertisements, and get paid for each person they refer.

## FACTUAL ALLEGATIONS: PURPORTED NATURE OF THE AFFILIATE MARKETING PROGRAM

24.   A document titled "Roomster Corp. Affiliate Marketing Program Terms and Condition [sic]" ostensibly governs Roomster's affiliate marketing program (the "Affiliate Terms").

25.   Roomster claims that it enforces these terms of service.

26. Roomster claims that the intent of its affiliate marketing program is for third-party websites to advertise for Roomster on their own sites, in exchange for referral payments.

27. The Affiliate Terms state: "To enroll in the Affiliate Program, you must … provide us with … the URL for your website that will link to the Company Website in connection with the Affiliate Program (the "Affiliate Website")."

28. Later, the Affiliate Terms state:

> [A] "referral" that entitles you to a referral fee payment … shall be defined as a person who has been directed to a Company Website through the use of a hypertext transfer link residing on the Affiliate Website which is in the form of a banner ad or other promotional link which automatically connects any person who clicks on the applicable banner ad or other promotional link to [Roomster's] Website, and which banner ad or other promotional link has been supplied to you by [Roomster] as part of the Affiliate Program in which you are participating.

29.  According to the above, a valid referral occurs when an affiliate places an advertisement for Roomster on *the affiliate's own* website, and a person clicks that advertisement.

## FACTUAL ALLEGATIONS: TRUE NATURE OF THE AFFILIATE MARKETING PROGRAM

30.  A former Roomster employee wrote the following to Plaintiff: "[Roomster has] an affiliate program that hires people in India to create fake listings on Craigslist, Facebook groups and HotPads. The affiliates get in contact with renters with fake identities, send them deep links created by Roomster then delete all traces once a person creates an account on Roomster."

31.  The former employee's statement is true.

32.  Roomster intends for its affiliates to spam third-party websites with fake listings for apartments and rooms for rent. These listings ultimately direct victims to sign up for Roomster.

33.  Roomster does not truly intend for its affiliates to post advertisements on the affiliates' own websites, or at least this is not the primary aim of its affiliate marketing program.

34.   Despite its Affiliate Terms stating that affiliates "must provide" the URL to
      their Affiliate Website in order to enroll in the Affiliate Program, Roomster
      allows its affiliates to operate without providing such a URL.

35.   Roomster allows its affiliates to operate without providing such a URL
      because it does not expect its affiliates to advertise on their own websites,
      but rather on third-party websites like Craigslist, Facebook, and HotPads.

36.   Roomster instructs its affiliates to take steps which make it harder for an
      automated anti-spam system to detect the affiliates' activities, and which
      have no legitimate business purpose. Specifically:

      a.   Roomster instructs its affiliates to refer people via internet links which
           Roomster generates. These links use the internet domain "bnc.lt" and
           redirect to Roomster's website.

      b.   Roomster then instructs its affiliates to put the bnc.lt links behind two
           other redirect links. Specifically, Roomster's instructions say that after
           generating the bnc.lt redirect link, affiliates should "[t]hen use another
           URL, then also use tiny URL - this is the safe way!"[1]

_____

[1] TinyURL is a web service which allows anyone on the internet to create a redirect link that
    goes through tinyurl.com. For example, an internet user has created a tinyurl redirect link to
Complaint: Brandenfels v. Roomster Corp.                                              11

c. Elsewhere, roomster tells its affiliates: "Do not post direct links anywhere! Use tiny URL's or redirecting links!", and "No posting of our links is allowed! You must use a referring URL. We search for our links everyday. If we find them we remove you and withhold all payments".

d. For a business that is not engaged in wrongdoing, there is nothing 'safer' about sending a person through three redirect URLs before the user finally arrives at the business' website, as compared to sending them through just one redirect URL.

e. Chaining multiple redirect URLs in a row makes it harder for an automated system, such as an automated anti-abuse system, to detect the final destination of a redirect.

f. Roomster considers hiding its website behind three redirect URLs to be the "safe way" because it believes that its affiliate marketers' practices are abusive, and that chaining redirect URLs will prevent automated anti-abuse systems from detecting its affiliates' activities.

---

"www.example.com", which is "tinyurl.com/7567". Anyone who navigates their web browser to "tinyurl.com/7567" is now redirected to "www.example.com".

37.  In an internal web page for affiliates, Roomster writes "We will terminate any affiliate account that spams or posts on Facebook". But shortly after, on the same page, they either explicitly instruct or imply that affiliates should post to facebook, in four different places:

   a.  (As a step in a series of instructions for affiliates): "4. Post the link in a FB group with Pictures."

   b.  "Affiliates are over posting and spamming FB groups. Do not post links in comments. Any affiliate who posts links in comments will be blocked & account removed. You may only post rooms for rent, or people who need rooms (with pictures) and a link to the correct listing on Roomster."

   c.  "FB group admins are complaining that Roomster affiliates are posting in the comments of groups. This is NOT allowed. You must post "rooms for rent" or "people looking for rooms". We are checking & will remove any affiliate who is posting in comments!"

d. "We removed many affiliates today who posted auto-redirecting links on FB like https://goo.gl/f2Wuk9. You must post links like http://www.crazroom.com/.

38. By providing a rule, and then instructing its affiliates to break that rule mere paragraphs later, Roomster intends to send a message to its affiliates that its rules are not meant to be taken seriously.

39. Since the Affiliate Terms require referrals to come via a "banner ad or other promotional link" which "resid[es] on the Affiliate Website", Facebook posts are not a valid way to obtain referrals according to the terms.

40. Roomster provides the following tip to its affiliates: "Make sure any messages sent are clear and written in the clear and easy to read English, or whatever the local language you are promoting to." [sic].

41. 'Sending messages' is not a valid way to obtain referrals according to the Affiliate Terms.

42. Roomster's Affiliate Terms do not, in practice, govern its affiliate marketing program.

43. Roomster's Affiliate Terms only exist to make its affiliate marketing program appear to be legitimate, when it is in fact a spam advertising scheme.

44. Many of Roomster's affiliates follow a particular pattern: They post fake listings for rooms for rent on Craigslist, and set up an automated system to monitor people's email replies to those listings. The automated system detects when phone numbers are present in people's email replies, and then sends text messages to those phone numbers, which tell the person that they must sign up for a Roomster account in order to view or rent the room.

**FACTUAL ALLEGATIONS: ROOMSTER SPAM RECEIVED BY PLAINTIFF, & PLAINTIFF'S RELATIONSHIP WITH ROOMSTER**

45. In mid-April 2019, Plaintiff began searching for a room to rent on Craigslist. Between then and early June (when Plaintiff signed a lease for his current residence), Plaintiff sent email replies to many Craigslist posts. These email replies generally contained Plaintiff's cell phone number. During this period, Plaintiff resided in Mountain View, CA.

46.   After his replies to some of the Craigslist posts, Plaintiff began receiving text messages concerning those Craigslist posts, which directed him to sign up for Roomster.

47.   Plaintiff often included language to the effect of "please do not send text messages, so I know this isn't a fake listing" in his email replies to Craigslist posts.

48.   Plaintiff received the 57 text messages documented in Exhibit A. These text messages advertise Roomster's services, and were sent by Roomster's affiliate marketers to Plaintiff's personal cell phone number.

49.   Plaintiff's phone number, at which he received the above-mentioned text messages, has been registered in the National Do Not Call Registry since July 29, 2016.

50.   Plaintiff has never agreed to the Roomster terms of service.

51.   Plaintiff has never entered into any sort of legally binding agreement with Roomster.

52.   Plaintiff has never signed up for Roomster.

53. The text messages referenced in the previous paragraph were sent by a computer system or computer systems with the capacity to store or produce telephone numbers to be called using a random or sequential number generator.

54. Plaintiff never gave express written consent to receive autodialed text messages regarding Roomster.

55. Plaintiff never gave express written consent to receive text message advertisements regarding Roomster.

56. Plaintiff specifically requested not to receive any text messages in most of his craigslist replies.

57. The text messages that Plaintiff received violated his statutorily-granted right to control whether a party may send autodialed text messages to his cell phone.

58. The text messages that Plaintiff received violated his statutorily-granted right to control whether a party may send telemarketing messages to his cell phone.

## FACTUAL ALLEGATIONS: DETAILED DESCRIPTIONS OF THE TEXT MESSAGES

Note: This section is included mainly to fulfill the Rule 9 (b) requirement to plead fraud with particularity. Most readers can skim or skip it.

59.   Several of the text message advertisements that Plaintiff received began with "Hi,I am the owner". Each incident consisted of several text messages.

60.   On one particular such incident, the messages read: "Hi,I am the owner. If you need the room, just signup/signin www.aptshare24.info here. then i'll call you and setup a time to view the room.". This incident occurred on April 25, 2019, at 8:14 AM. The sender's phone number was 360-334-6965.

61.   The "Hi,I am the owner" messages were all sent by the same Roomster affiliate (the "Owner Message Affiliate").

62.   The Owner Message Affiliate does not, in fact, own the properties that they claim to own in the text messages.

63.   The Owner Message Affiliate does not send these text messages on behalf of any person or party who does own or is attempting to rent out any rooms.

64.   The Owner Message Affiliate's claim to own the properties in question is a deliberate lie.

65.   The Owner Message Affiliate is engaged in a scheme to induce consumers to purchase Roomster by posting fake Craigslist ads, harvesting consumers' phone numbers from their replies to those Craigslist ads, and sending those consumers text messages which falsely represent that the sender is the owner of a particular room for rent, and that consumers will be able to rent that room if they sign up for Roomster.

66.   Several of the text message advertisements that Plaintiff received took the form of: "[Received your email regarding/just got your email for] my CL ad [name of Craigslist ad]. Please contact with the room owner directly at [website URL]". The linked website leads to a page containing a name and photo, along with the messages "I am looking for a Roommate" and "Feel free to call or text me anytime to set up a time for viewing or if you have any other query". The page also contains a "reveal" button which claims to reveal the person's contact information, but which, when clicked, tells the user: "To protect from web scraper, robot and scam, only registered member can reveal phone number. To reveal the number please Login or Register

and verify your profile. It is free and takes only few clicks.", and then

redirects the user to Roomster's website.

67.   One such text message that Plaintiff received read "just got your email for

my cl ad "NEWLY RENOVATED SINGLE ROOMS NEAR FINANCIAL

DISTRICT" Please contact with the room owner directly at

www.m.call4room.com".

68.   Plaintiff received this message on April 17, 2019 at 9:31 AM, from

770-737-7943.

69.   The link to www.m.call4room.com lead to a website matching the

description given in the previous paragraph, and contained an image of a

woman identified as "Lisa Allison".

70.   The "Received your email"-like text messages all sent by the same Roomster

affiliate ("Received Your Email Affiliate").

71.   The web pages linked to by the Received Your Email Affiliate do not

contain profiles of real people. Or alternatively, the web pages contain

profiles of real people, but the web pages were created without those

people's knowledge, and the Sender had no basis to believe that the people

in question were actually looking for roommates at the time that the Sender
sent the text messages.

72.   The web pages linked to by the Received Your Email Affiliate do not have
the capacity to reveal the phone numbers of the people whose profiles it
presents, even to users who follow the directions that will purportedly allow
them to reveal the number.

73.   The Received Your Email Affiliate deliberately and falsely claimed in the
text messages that the "owner" of the supposed room for rent could be
contacted at the linked website.

74.   The Received Your Email Affiliate deliberately and falsely claimed that
after a user signs up for Roomster, the "reveal" button on the Sender's
website would reveal the "owner" of the room's phone number.

75.   The Received Your Email Affiliate is engaged in a scheme to induce
consumers to purchase Roomster under false pretenses by posting fake
Craigslist ads, harvesting consumers' phone numbers from their replies to
those Craigslist ads, sending text messages to those consumers, directing
them in the text messages to a link, which ultimately instructs users to sign

up for Roomster and falsely claims that after doing so, they will be able to view the contact information for a particular person looking for roommates.

76.   Some of the text messages Plaintiff received took the form of: "[Plaintiff's cell phone number]. You replied to my craigslist ad.Room still available. Thanks for your interest. Just sign up the link & lemme know when done for next step. [link that redirects to Roomster] Let me know when you are done.". Each incident was composed of several text messages.

77.   One such series of text messages that Plaintiff received read: "[Plaintiff's cell phone number]. You replied to my craigslist ad.Room still available. Thanks for your interest. Just sign up the link & lemme know when done for next step. http://ava.rommie.icu Let me know when you are done.". This was sent to Plaintiff's cell phone at 3:01 PM from the number 617-545-7973.

78.   The "You replied to my craigslist ad" text messages were all sent by the same Roomster affiliate ("You Replied Affiliate").

79.   The You Replied Affiliate does not rent out any rooms in the United States.

80.   The You Replied Affiliate does not act on behalf of anyone who rents out any rooms in the United States.

81.  The You Replied Affiliate deliberately and falsely implied in their text messages that they were renting out a room, and that the recipient would have an opportunity to rent that room if they signed up for Roomster using the given link.

82.  The You Replied Affiliate is engaged in a scheme to induce consumers to purchase Roomster by posting fake Craigslist ads, harvesting consumers' phone numbers from their replies to those Craigslist ads, and then sending them text messages which falsely imply that they may rent a room from the Sender after signing up for Roomster.

83.  One text message Plaintiff received read "Hi, Yes! It's as yet open & I'm the landlord. In the sake of viewing or visiting? Just go & Apply here:' Goo.gl/XRTBPX ' (security reason) & set up an appointment on there then I'll contact you ASAP." Plaintiff received this message on May 15, 2019, at 8:51 AM, from 626-609-0925.

84.  The sender of this 'Goo.gl/XRTBPX' message was not a landlord and did not have a room for rent.

85.  The sender of the Goo.gl/XRTBPX message is a Roomster affiliate.

86. The sender of the Goo.gl/XRTBPX message falsely represented that they were a landlord in an attempt to induce Plaintiff to sign up for Roomster.

87. The sender of the Goo.gl/XRTBPX message is engaged in a scheme to induce consumers to purchase Roomster by posting fake Craigslist ads, harvesting consumers' phone numbers from their replies to those Craigslist ads, and then sending them text messages which falsely state that the sender is a landlord with a room for rent that may be viewed with a Roomster account.

88. Some text messages that Plaintiff received read "Room still available if interested do registration/sign up here> www.roomrental24.info then I'll call you and set up a time to view the room."

89. Plaintiff received one such message on May 8, at 10:01 PM.

90. www.roomrental24.info ultimately redirected to Roomster when Plaintiff received the messages.

91. All such messages were from the same sender (the "www.roomrental24.info Sender").

92. The www.roomrental24.info Sender falsely represented in the text messages that they had a room for rent, which Plaintiff could view if he signed up for Roomster.

93. The www.roomrental24.info Sender is engaged in a scheme to induce consumers to purchase Roomster by posting fake Craigslist ads, harvesting consumers' phone numbers from their replies to those Craigslist ads, and then sending them text messages which falsely state that the sender will call to arrange a tour of an apartment if the recipient signs up for Roomster.

94. One text message that Plaintiff received read "I'm glad to know you're interested please login here ( http://goo.gl/vuQR16 ) & Room available to view let me know when done." This text was followed by a link to the original Craigslist post that it was in regard to. Plaintiff received it on May 9, 2019, at 6:50 AM, from 614-219-9349.

95. The sender of this text message falsely implied that they had a room available to view.

96. The sender of this text message is a Roomster affiliate.

97.  The sender of this text message is engaged in a scheme to induce consumers to purchase Roomster by posting fake Craigslist ads, harvesting consumers' phone numbers from their replies to those Craigslist ads, and then sending them text messages which falsely imply that the sender has a room that the recipient can view if they sign up for Roomster.

98.  Neither Roomster nor the affiliates described in this section are located in California, so the text messages described above were sent in interstate commerce.

99.  All of the text messages that Plaintiff received were sent over a wire or radio.

## FACTUAL ALLEGATIONS: THE NATURE OF THE RELATIONSHIP BETWEEN ROOMSTER AND ITS AFFILIATES

100.  Roomster's affiliates are its agents.

101.  Roomster exercises control over the methods by which its affiliate marketers advertise its services.

102.  Roomster allows its affiliate marketers to use its trademarks.

Complaint: Brandenfels v. Roomster Corp.                                    26

103.  Roomster supplies software tools and/or instrumentalities for its affiliate marketers to use in their activities as Roomster's affiliate marketers.

104.  Further investigation or discovery will reveal other facts which indicate a principal-agent relationship between Roomster and its affiliate marketers.

## FACTUAL ALLEGATIONS: ROOMSTER'S KNOWLEDGE OF ITS AFFILIATES' FRAUDULENT AND SPAM ACTIVITIES; FAILURE TO ACT

105.  Since Roomster's affiliates are its agents, their knowledge may be imputed onto Roomster. The rest of this section should not be construed to imply otherwise.

106.  Roomster is aware that its affiliate marketing program creates a monetary incentive for its affiliates to violate the law.

107.  Roomster has never done any sort of vetting of its affiliate marketers prior to letting them join the marketing program.

108.  In September 2016, CBS SF Bay Area published a news article titled "Roomster App Manages To Make Bay Area Apartment Hunting Even

Harder"[2]. The article described how, after replying to Craigslist posts, a San Francisco resident received text messages advertising Roomster, in circumstances similar to Plaintiff's.

109. Roomster was aware of the above CBS article, and gave comment for that article.

110. In September 2016, a complaint was filed against Roomster in the Southern District of New York (titled *Zunno v. Roomster Corp.*, case no. 1:16-cv-07356-ALC), alleging violations of the TCPA by Roomster. This complaint was later voluntarily dismissed.

111. In December 2017, SFGate published an article titled "SF renters are now facing another, very bizarre headache"[3]. The article again described a person receiving text messages advertising Roomster, after replying to Craigslist posts.

112. Roomster was aware of the SFGate article and gave comment for it.

---

[2] sanfrancisco.cbslocal.com/2016/09/12/roomster-app-manages-to-make-bay-area-apartment-hunting-even-harder/

[3] www.sfgate.com/realestate/article/roomster-bay-area-rent-housing-craigslist-roommate-12428199.php

Complaint: Brandenfels v. Roomster Corp.                                    28

113. In response to the above incidents, Roomster did not substantively change any aspect of its affiliate marketing program to prevent its affiliates from sending text message spam.

114. Between September 2016 and today, Roomster and its officers have never believed, nor had reason to believe that its affiliates had ceased to advertise Roomster via unsolicited text messages.

115. Roomster monitors consumer complaints about Roomster that are posted to the website "Sitejabber" (sitejabber.com).

116. Roomster has responded to several consumer complaints on Sitejabber.

117. One particular complaint on Sitejabber, posted by a user on December 13, 2018, read: "Was lured from Craigslist with deceptive advertising. They advertise on craigslist asking you to create an account to apply for the Craigslist advertised room. I created an account and paid for a week subscription. I Sent out 13 messages about open rooms on the website and didn't get a single response. I'm not even convinced that the advertised postings on Craigslist were real; they're really just looking to lure you into a

paid subscription. I don't mind paying for a legitimate service, but this reeks of deceptive advertising and foul play."

118.   Mr. Shriber read the above-quoted Dec. 13 complaint. He responded to the complaint on December 15, with a message that read: "Max, Every single listing on Roomster is created by a real person using a social login and verified using an email & text. We record an ip address for every single account created and login history. I'm sorry that you didn't like our service, but your post is irresponsible. As you may know you created an account on roomster on 1/13/2017 11:39:30 PM, using FB login we verified you using your Linkedin, email & text on 12/3/2018 9:38:58 PM when you accessed your account. All our users are just as real as you."

119.   Roomster was able to identify the Roomster account of the person who posted the above-quoted Sitejabber complaint.

120.   At the time that Mr. Shriber replied to the above Sitejabber complaint, Roomster had a record of which affiliate marketer referred that particular user to Roomster (the "Sitejabber Complainer Referrer").

121. At the time that Mr. Shriber replied to the above Sitejabber complaint, Roomster knew or suspected that the Sitejabber Complainer Referrer had posted ads for rooms on Craigslist which did not correspond to real rooms that were listed for rent on the Roomster platform.

122. At the time that Mr. Shriber replied to the above Sitejabber complaint, Roomster knew or suspected that the Sitejabber Complainer Referrer was sending unsolicited text messages to people.

123. At the time that Mr. Shriber replied to the above Sitejabber complaint, Roomster did not ban or take disciplinary action against the Sitejabber Complainer Referrer.

124. After Mr. Shriber replied to the above complaint, Roomster paid a referral fee to the Sitejabber Complainer Referrer at least once.

125. After Mr. Shriber replied to the above complaint, Roomster charged a membership fee to at least one user who was referred by the Sitejabber Complainer Referrer.

126. Roomster monitors consumer complaints about Roomster that are posted to the website of the "Better Business Bureau" ("BBB").

127.   Roomster has responded to several complaints on the Better Business
Bureau's website.

128.   One such complaint, posted to the BBB website on May 30, 2017, reads as
follows (note that the BBB stars out identifying information such as website
names): "I came across 3 ads of a similar nature, but I will only address the
most recent one I have experience specifically. While searching for places to
rent on **********, I found what seemed to be a particularly great deal for
a room to rent on **********, the kind that seems too good to be true
similar to the scams on **********, but this is different. After contacting
the owner of the advertisement, I shortly after receive a text message asking
for me to sign up at a provided link that has been shortened using ******
URL shortener, and that soon after we can schedule a time to meet and see
the room. It ends with a "Sorry for the inconvenience.". So I followed the
link which brings me to the sign up page for Roomster. After I finished I
replied to the text message, which then returns again asking me to upgrade
my account to the member status costing money. Luckily, during this most
recent occurrence of finding one of these ads, I already had a member
account, so I replied to each text within seconds of the previous. Funny thing

is that after I had mentioned that I had paid for the member account, the

contact went dead. I have sent many texts and still no reply. Once again,

there were very short time intervals between messages no longer than a

minute, the person did not simply go away, it is very probably a trick to

make me pay for a member account. I will provide pictures of the texts and

********** ***".

129.   Roomster read the above-quoted BBB complaint, and replied to it on June 1,

2017 as follows: "To Whom It May Concern: We received a BBB customer

complaint letter from **** **** ****** We do not have any affiliation with

********** and do not have control over what Roomster members do or

post while on other sites. We can only track links and emails that originate

on the Roomster site. Search for a listing is a free service, person doesn't

need to upgrade his account to do that. Upgrading your account gets you full

access to your mailbox, send and receive voice calls, text messages and click

through to all member's profiles on ********* ******** ******** *

********* (when available) He used our service, read and respond to the

messages he got at Roomster mailbox."

130. The above BBB complaint contained sufficient information for Roomster to identify the affiliate marketer whose referral links were pointed to by the URL shortener. ("BBB Complaint Affiliate").

131. At the time that Roomster replied to the above complaint, Roomster knew or suspected that the BBB Complaint Affiliate had posted ads for rooms on Craigslist which did not correspond to real rooms that were listed for rent on the Roomster platform.

132. At the time that Roomster replied to the above complaint, Roomster knew or suspected that the BBB Complaint Affiliate was sending unsolicited text messages.

133. At the time that Roomster replied to the above complaint, Roomster did not ban or take any disciplinary action against the BBB Complaint Affiliate.

134. After Roomster replied to the above BBB complaint, Roomster paid the BBB Complaint Affiliate a referral fee at least once.

135. After Roomster replied to the above BBB complaint, Roomster accepted membership fees from at least one user who was referred by the BBB Complaint Affiliate.

136.  After Roomster replied to the above BBB complaint, Roomster accepted membership fees from at least one user who was referred by the BBB Complaint Affiliate.

137.  Roomster has either directly received or become aware of many consumer complaints which allege, allude that, or logically imply that Roomster's affiliate marketers are engaged in spam, fraudulent advertising, or unsolicited telemarketing. This happened in at least March 2015, April 2015, May 2015, June 2015, September 2015, October 2015, December 2015, February 2016, March 2016, May 2016, August 2016, September 2016, October 2016, November 2016, February 2017, May or June 2017, July 2017, August 2017, September 2017, December 2017, April 2018, December 2018, February 2019, and April 2019.

138.  Roomster has received multiple requests from consumers to stop receiving text messages advertising Roomster's services.

139.  In at least some cases, after receiving the unsubscribe requests referenced in the previous paragraph, Roomster did not take any steps to prevent those

specific consumers from receiving future marketing texts from Roomster's affiliates.

140. In September 2016, in an email exchange with a Facebook group administrator who was complaining about spam by Roomster's affiliates, Defendant Shriber wrote: "These are affiliates. They are people that we don't know, but it is my experience when i give them specific [sic] and tell them that they will not be paid if they do this, they listen."

141. Roomster believes that an effective way to prevent its affiliate marketers from doing something is to post a message with specific instructions not to do that thing, and a warning that marketers who do it won't be paid.

142. Roomster does not prominently display any message to its affiliate marketers that they will not be paid if they send unsolicited text messages to consumers. Or, they did not until they became aware that this legal action was likely to occur.

143. Roomster does not prominently display any message to its affiliate marketers that they will not be paid if they use fake identities or false

pretenses to acquire customers. Or, they did not until they became aware that this legal action was likely to occur.

144.   Roomster prominently displays many other messages and instructions to its affiliate marketers, and emphasizes some of them with colored and/or bolded text.

145.   Roomster's terms of service state: "Under California Civil Code Section 1789.3, users located in California are entitled to the following consumer rights notice: If a user has a question or complaint regarding the Service, please send an email to help@roomster.com."

146.   The help@roomster.com email inbox is regularly monitored by agents of Roomster.

147.   Roomster ignores emails sent to the help@roomster.com address which complain about text message spam.

148.   Roomster has failed to implement effective systems, procedures, or policies to prevent its affiliates from engaging in fraudulent advertisement and illegal telemarketing.

149. Roomster's failure to implement such systems, procedures, or policies is deliberate, and intended to allow Roomster to continue benefiting financially from such activities.

150. In instances where Roomster has banned affiliate marketers due to suspicion or actual knowledge that the affiliate violated US or state law, Roomster has kept the money that it gained due to those potential violations, and has continued to accept subscription fees from Roomster subscribers who were referred by the banned marketer.

151. For every affiliate marketer actively participating in Roomster's marketing program, Roomster possesses knowledge of either that marketer's identity, or information which could be used by government agencies to establish that marketer's identity (e.g. payment information).

152. In every instance where Roomster has become aware that an affiliate violated US or state law, Roomster has not referred that affiliate's information to any government agencies who would be responsible for enforcing those laws.

153.   Where Roomster has been aware of criminal or tortious behavior by its
affiliates: Aside from customers who have filed lawsuits, threatened legal
action against Roomster, or requested refunds from Roomster, Roomster has
never attempted to compensate its customers who were harmed by criminal
or tortious behavior by its affiliates, or to notify those customers that they
were victims of such behavior, despite having precise knowledge of which
customers were obtained by which affiliates. This is true even for users who
Roomster knows were referred to Roomster under false pretenses.

## FACTUAL ALLEGATIONS: ROOMSTER'S FAKE APP REVIEW SCHEME, AND USE OF THE RESULTING INCOME

154.   A former Roomster employee wrote the following to Plaintiff: "They simply
do not care about their customers' experience, only profit. I believe you have
read enough reviews on BBB, despite their fake paid reviews on App Store."

155.   Roomster has paid some party or organization to leave fake positive reviews
for the Roomster app on the Apple and Google application stores.

156.   For example, one such fake Roomster review was posted to the Google Play
store at least four times: "I enjoy using the app. But one of the more recent
updates added neighborhood tags to the map. These can cover listings and

make it difficult to click on them. If one is clicked then all listings outside of that area are removed and it can be confusing if you didn't realize that." This was posted as a five-star review by four distinct Google accounts on February 18, March 6, March 9, and March 18, 2019.

157.   The following is another fake Roomster review which was posted several times by different Google accounts on the Google Play store: "With this great app I was able to find me a very nice place to stay & now call my new home... it's a great app & information is always submitted me to daily & I love the set up of how you can either call or email the landlord". It was posted as a five-star review by five different Google user accounts on February 18, February 21, March 7, March 10, and March 12, 2019.

158.   The following is another fake Roomster review which was posted several times by different Google accounts to the Google Play Store: "Wow what a great idea !!! It was a great experience for me to use this app and find a roomate who never knew me .they gave me one of best of the best roomate ever lol". It was posted as a five-star review by six different Google user accounts on February 20, February 21, March 6, March 10, March 11, and March 14, 2019.

159.  The following is another fake Roomster review which was posted on the
      Google Play store: "Do you want to find roommates? Roomster will help
      you. I have downloaded this app on my iPhone. It's really easy to use. I like
      it because it is very useful in my life. Great!". It was posted as a five-star
      review on March 2, 2019. (While this reviewer claims to have installed the
      app on their iPhone, the Google Play store offers only Android apps, which
      cannot be installed on an iPhone. Additionally, the Google Play Store app
      itself cannot be accessed from an iPhone, so a person who uses an iOS
      device and not an Android device could not have left this review on the
      Google Play store.)

160.  Each of the above-quoted Google reviews was posted by some party or
      parties who were paid by Roomster. Where two such reviews have the same
      contents, they were posted by the same party.

161.  When a single party uses multiple accounts to post multiple positive reviews
      of the same app on the Google Play store, they falsely represent that each of
      those reviews was posted by a different party, and that each party who
      posted such a review had a positive experience with the app. In aggregate,

this has the effect of falsely representing the number of people who had positive experiences with the app.

162. Roomster pays for such fake reviews on a regular basis, periodically 'topping off' their app with new fake reviews whenever the average score drops too low.

163. Roomster has paid for fake reviews on a regular basis since 2015 or earlier.

164. By paying for a party or parties to post fake positive reviews on the Google and Apple application stores ("Fake App Reviews"), Roomster intends to mislead consumers about what proportion of Roomster users are satisfied enough with Roomster to leave a positive review. In doing this, they hope that some of these consumers will decide to purchase Roomster membership on the basis of this false information.

165. Roomster's app contains writings. When Roomster publishes its app to the Google and Apple application stores, it transmits those writings over a wire.

166. As of the date of filing this complaint, Roomster most recently published its Android app to the Google Play store on January 10, 2020, and its iOS app to the Apple app store on January 10, 2020.

167. The Google Play and Apple app stores serve Roomster to users who are located in American states outside of New York, and thus affect interstate commerce.

168. When a user views Roomster's Android or iOS app on their respective platforms, the user sees the average rating of the app, and has the ability to read detailed reviews of the app.

169. The average review score is an important factor in determining whether users are willing to install or pay for an app.

170. The true average rating of Roomster's apps, absent fake reviews, is less than three out of five stars.

171. Roomster's app on the Google and Apple application stores allows users to purchase a subscription from within the app.

172. Roomster regularly accepts subscription fees from users who purchase subscriptions via its app on the Google or Apple stores.

173. Roomster has regularly accepted subscription fees via the Google and Apple application stores since it began its Fake App Review scheme.

Complaint: Brandenfels v. Roomster Corp.                                    43

174. Some income from these subscription fees is attributable to the Fake App Review scheme, since users are much less likely to purchase services with bad reviews.

175. Roomster has used some such income to fund its affiliate marketing program.

**FACTUAL ALLEGATIONS: DEFENDANTS SHRIBER AND ZAKS' INVOLVEMENT IN THE AFFILIATE MARKETING PROGRAM**

176. Defendants Shriber and Zaks were closely involved in the creation of the affiliate marketing program, and remain involved in its management and day-to-day operations.

177. Defendants Shriber and Zaks are aware that the true purpose of the affiliate marketing program is to refer customers to Roomster via fake housing ads on third-party sites.

178. Defendants Shriber and Zaks are aware that it is common for Roomster's affiliate marketers to send fraudulent, autodialed text message advertisements to unconsenting consumers in order to obtain referrals.

Complaint: Brandenfels v. Roomster Corp.                                    44

179. Defendants Shriber and Zaks have not acted in their capacities as executives of Roomster to stop their affiliate marketers from spamming consumers, or to the extent that they have done so, it has been performative and deliberately ineffective.

180. Defendants Shriber and Zaks wish for the affiliate spam to continue, because as major shareholders of Roomster, they personally profit from this spam.

## COUNT 1: VIOLATIONS OF 47 U.S.C. § 227 (b) (1) (A) (iii)

181. Plaintiff incorporates by reference all of the paragraphs in the above "FACTUAL ALLEGATIONS" sections as though fully stated herein.

182. Each of the aforementioned 57 text messages constitutes a violation of 47 U.S.C. § 227 (b) (1) (A) (iii) by Roomster's affiliates.

183. The aforementioned text messages harmed Plaintiff by depriving him of his right to control which parties are allowed to send autodialed text messages to his cell phone.

184. Roomster's affiliates were acting in their capacities as Roomster's agents, and for Roomster's benefit, when sending the text messages.

185. Under 47 U.S.C. § 227 (b) (3), Plaintiff is entitled to $500 from Roomster for each of the 57 violations, for a total of $28,500.

186. The fact that Roomster was previously sued under the TCPA demonstrates that it is aware of the TCPA laws and regulations. This exceeds the standard required for the Court to treble damages under 47 U.S.C. § 227 (b) (3).

187. Because Defendants Shriber and Zaks acted as officers of Roomster, were generally aware of the TCPA violations by Roomster's affiliates, personally benefited from these violations, and participated in managing Roomster's affiliate marketing program, they should, in their personal capacities, be held jointly liable for any damages for which Roomster is found liable under this count.

188. 47 U.S.C. § 227 (b) (3) also permits Plaintiff to seek an injunction against future auto-dialing violations by Roomster.

**COUNT 2: VIOLATIONS OF 47 CFR 64.1200 (c) (2)**

189. Plaintiff incorporates by reference all of the paragraphs in the above "FACTUAL ALLEGATIONS" sections as though fully stated herein.

190. Each of the 57 aforementioned text messages constitutes a "telephone solicitation" for the purposes of CFR 64.1200 (c).

191. 47 CFR 64.1200 (e) causes 47 CFR 64.1200 (c) (2) to apply to cell phones.

192. Each of the 57 aforementioned text messages constitutes a violation of 47 CFR 64.1200 (c) (2), due to Plaintiff's cell phone number being on the Do Not Call List.

193. Roomster's affiliates were acting in their capacities as Roomster's agents, and for Roomster's benefit, when sending the text messages.

194. Alternatively to the above paragraph: Irrespective of whether Roomster's affiliates are its agents, the affiliates sent the text messages "on behalf of" Roomster for the purposes of 47 U.S.C. § 227 (c) (5).

195. The aforementioned text messages harmed Plaintiff by depriving him of his right to control which parties are allowed to telemarket to his cell phone.

196. Under 47 U.S.C. § 227 (c) (5), Plaintiff is entitled to seek $500 from Roomster for each of the 57 violations, for a total of $28,500.

197. The fact that Roomster was previously sued under the TCPA demonstrates that it is aware of the existence of the TCPA. Roomster additionally was

aware of a pattern of TCPA violations by its affiliate marketers, over a span of several years. Despite this, Roomster willfully did not establish effective procedures to prevent its affiliate marketers from contacting phone numbers on the Do Not Call List in contravention of the TCPA. This meets the willfulness standard required for the Court to treble damages under 47 U.S.C. § 227 (c) (5).

198. Because Defendants Shriber and Zaks acted as officers of Roomster, were generally aware of the TCPA violations by Roomster's affiliates, personally benefited from these violations, and participated in managing Roomster's affiliate marketing program, they should, in their personal capacities, be held jointly liable for any damages for which Roomster is found liable under this count.

199. 47 U.S.C. § 227 (c) (5) also permits Plaintiff to seek an injunction against future telemarketing violations by Roomster.

## COUNT 3: NEGLIGENCE

200. Plaintiff incorporates by reference all of the paragraphs in the above "FACTUAL ALLEGATIONS" sections as though fully stated herein.

201. Roomster owes a general duty of care to the public.

202. It was foreseeable to Roomster that its affiliate marketing program would create an incentive for its affiliates to engage in spam.

203. Given the prior TCPA lawsuit, the news articles, and the numerous consumer complaints that Roomster was aware of regarding spam text messages by its affiliates, Roomster should have known that many of its affiliates advertised Roomster via unsolicited text messages.

204. It was foreseeable to Roomster that this text message problem would continue if it kept operating its Affiliate Program in the same way, without taking additional precautions against text message spam.

205. There were many things that Roomster could have feasibly done to reduce text message spam:

    a. Roomster could have enforced the requirement in their Affiliate Terms that affiliates must provide the URL of their website when they sign up, instead of allowing anyone to sign up without providing a website.

b. Roomster could have prominently displayed a message to affiliates giving them specific instructions not to send text messages, under penalty of not being paid. Defendant Shriber even stated in the previously quoted email that in his experience, this method works.

c. Instead of ignoring consumer complaints that mentioned unwanted text messages, Roomster could have proactively replied and requested more information, in order to identify and ban the affiliates responsible.

206. Roomster breached its duty to the public by continuing to operate its affiliate program without taking the above or any other reasonable precautions against text message spam.

207. If not for Roomster's operation of its affiliate marketing program without sufficient precautions, Plaintiff would not have received the above-alleged text messages.

208. The 57 text messages that Plaintiff received constitute violations of 47 U.S.C. § 227 (b) (1) (A) (iii), which prohibits automated calls to cell phones.

209. The 57 text messages that Plaintiff received constitute violations of 47 CFR 64.1200 (c) (2), which prohibits telemarketing to numbers on the do-not-call list.

210. The aforementioned text messages violated Plaintiff's statutorily-granted rights to control who may send him autodialed and telemarketing messages.

211. The TCPA assigns an objective minimum pecuniary value to injuries to the above rights - $500 for each violation of the right to prevent parties from initiating telemarketing to a cell phone, under 47 U.S.C. § 227 (c) (5); and $500 for each violation of the right to prevent parties from initiating autodialed calls to a cell phone, under 47 U.S.C. § 227 (b) (3). By this measure, plaintiff's damages total $57,000 (57 text messages * 2 violations per message * $500 per violation).

## COUNT 4: VIOLATIONS OF 18 U.S. CODE § 1962 (a) BY ROOMSTER

212. Plaintiff incorporates by reference all of the paragraphs in the above "FACTUAL ALLEGATIONS" sections as though fully stated herein.

213. Together, Roomster and the parties who posted the Fake App Reviews constitute an enterprise for the purposes of 18 U.S. Code § 1962 (the

"Roomster Fraudulent Marketing Enterprise" or "RFME"). The purpose of this enterprise is to obtain paying customers for Roomster.

214. Alternatively, Roomster itself may be considered the "Roomster Fraudulent Marketing Enterprise" for the purposes of this count.

215. The RFME is engaged in or affects interstate commerce (as many Roomster customers are not located in New York).

216. The purchase of Fake App Reviews by Roomster, described above, constitutes a scheme by Roomster to obtain money under false pretenses. The false pretense is that users who reviewed Roomster, on average, gave it a high rating. Roomster intends for this to make potential customers more willing to purchase Roomster via the app.

217. By publishing their Android and iOS apps to the Google and Apple application stores, Roomster furthered the Fake App Review scheme. These acts of publishing involved transmitting writings "by means of wire … in interstate or foreign commerce". Thus, these acts of publishing constitute violations of 18 U.S. Code § 1343 ("wire fraud").

218. Under 18 U.S. Code § 1961 (1) (B), violations of 18 U.S. Code § 1343 ("wire fraud") constitute "racketeering activity" for the purposes of 18 U.S. Code § 1962.

219. The Fake App Review scheme constitutes a "pattern" of racketeering activity by Roomster for the purposes of 18 U.S. Code § 1962 because it is:

    a. Composed of many individual acts of wire fraud.

    b. Indiscriminately targeted to many victims.

    c. Ongoing over time, and will continue into the future for as long as the fake reviews are visible to the public and Roomster continues to publish its apps to the stores.

220. Roomster has violated 18 U.S. Code § 1962 (a): It received income derived from a pattern of racketeering activity, and it invested this income in the operation of the Roomster Fraudulent Marketing Enterprise by using it to fund its affiliate marketing program.

221. The text messages that Plaintiff received in connection with the above text message schemes constitute violations of 47 U.S.C. § 227 (b) (1) (A) (iii), which prohibits automated calls to cell phones.

Complaint: Brandenfels v. Roomster Corp.                                    53

222. The text messages that Plaintiff received in connection with the above text
message schemes constitute violations of 47 CFR 64.1200 (c) (2), which
prohibits telemarketing to numbers on the do-not-call list.

223. The aforementioned text messages violated Plaintiff's statutorily-granted
rights to control who may send him autodialed and telemarketing messages.

224. Under California law, these injured rights constitute property.

225. Plaintiff's injuries would not have happened but for Roomster's violation of
18 U.S. Code § 1962 (a): Had Roomster not funded its affiliate marketing
program, the marketers would not have engaged in the fraudulent,
unsolicited telemarketing that harmed Plaintiff.

226. Plaintiff's injuries were a natural and foreseeable consequence of Roomster
paying the affiliate marketers, because Roomster knew that many of its
affiliates marketed Roomster via autodialed and unsolicited text messages,
and Plaintiff's harms were a natural and foreseeable consequence of
autodialed and unsolicited text messages.

227. The TCPA assigns an objective minimum pecuniary value to injuries arising
from violations of the above property rights - $500 for each violation of the

Complaint: Brandenfels v. Roomster Corp.                                          54

right to prevent parties from initiating telemarketing to a cell phone, under

47 U.S.C. § 227 (c) (5); and $500 for each violation of the right to prevent

parties from initiating autodialed calls to a cell phone, under 47 U.S.C. § 227

(b) (3). By this measure, plaintiff's damages total $57,000 (57 text messages

* 2 violations per message * $500 per violation).

228.   Because Plaintiff suffered injuries to his property, and because there is an

objective pecuniary value assignable to those injuries, Plaintiff's injuries are

sufficient to meet the "injured in his business or property" standard required

to recover damages under 18 U.S. Code § 1964 (c).

229.   Under 18 U.S. Code § 1964 (c), Plaintiff is entitled to bring an action against

Roomster to recover the above TCPA damages because those damages were

a result of Roomster's violation of 18 U.S. Code § 1962 (a).

**COUNT 5: VIOLATIONS OF 18 U.S. CODE § 1962 (c) BY ROOMSTER**

230.   Plaintiff incorporates by reference all of the paragraphs in the above

"FACTUAL ALLEGATIONS" section as though fully stated herein.

231.   Together, Roomster and the third parties who posted the Fake App Reviews

constitute an enterprise for the purposes of 18 U.S. Code § 1962 (the

"Roomster Fraudulent Marketing Enterprise" or "RFME"). The purpose of this enterprise is to obtain paying customers for Roomster.

232. The RFME is engaged in or affects interstate commerce (as many Roomster customers are not located in New York).

233. The 57 text messages alleged above constitute violations of 18 U.S. Code § 1343 ("wire fraud"), because they are sent in furtherance of schemes "for obtaining money … by means of false or fraudulent pretenses", and sending the text messages constituted the transmission of writings "by means of wire … in interstate or foreign commerce".

234. Under 18 U.S. Code § 1961 (1) (B), violations of 18 U.S. Code § 1343 ("wire fraud") constitute "racketeering activity" for the purposes of 18 U.S. Code § 1962.

235. Roomster's affiliates were acting in their capacities as Roomster's agents, and for Roomster's benefit, when sending the text messages.

236. The fraudulent text messages constitute a "pattern" of racketeering activity by Roomster, since the associated schemes are ongoing over time, can be

expected to continue into the future, and are indiscriminately targeted to many people.

237. The text messages that Plaintiff received in connection with the above text message schemes violated 47 U.S.C. § 227 (b) (1) (A) (iii), which prohibits automated calls to cell phones.

238. The text messages that Plaintiff received in connection with the above text message schemes violated 47 CFR 64.1200 (c) (2), which prohibits telemarketing to numbers on the do-not-call list.

239. Plaintiff suffered harm to his property as a result of the above text messages, because they violated his statutorily-granted rights, which are property under California law.

240. The TCPA assigns an objective minimum pecuniary value to injuries to the above rights - $500 for each violation of the right to prevent parties from initiating telemarketing to a cell phone, under 47 U.S.C. § 227 (c) (5); and $500 for each violation of the right to prevent parties from initiating autodialed calls to a cell phone, under 47 U.S.C. § 227 (b) (3). By this

measure, plaintiff's damages total $57,000 (57 text messages * 2 violations per message * $500 per violation).

241. Because Plaintiff suffered injuries to his property, and because there is an objective pecuniary value assigned to those injuries, Plaintiff's injuries are sufficient to meet the "injured in his business or property" standard required to recover damages under 18 U.S. Code § 1964 (c).

242. The harms that Plaintiff sustained were foreseeable and natural consequences of the above-alleged 18 U.S. Code § 1343 ("wire fraud") violations, because:

   a. It is foreseeable and natural that sending unsolicited, autodialed telemarketing texts would injure a person's TCPA rights.

   b. In this case, the very act of sending the unsolicited, autodialed telemarketing messages *was also* the wire fraud.

243. Under 18 U.S. Code § 1964 (c), Plaintiff is entitled to bring an action against Roomster to recover the above TCPA damages because those damages were a result of Roomster's violation of 18 U.S. Code § 1962 (c).

## REQUEST FOR RELIEF

244.   Under 47 U.S.C. § 227 (b) (3), Plaintiff seeks an injunction against future autodialing violations by Defendants.

245.   Under 47 U.S.C. § 227 (c) (5), Plaintiff seeks an injunction against future telemarketing violations done by or on behalf of Defendants.

246.   Under 18 U.S. Code § 1964 (c), Plaintiff seeks from Roomster the damages in either Count 4 or Count 5 ($57,000 in either case). Plaintiff asserts that the 'knowing or willful' requirements are satisfied for the purposes of the TCPA's treble damages. This is multiplicative with the treble damages mandated by the RICO Act, for nonuple damages overall. Plaintiff believes that Defendants' conduct was particularly egregious in this case, and thus that applying nonuple damages is appropriate. Plaintiff requests that the Court award these nonuple damages, totaling $513,000.

247.   Alternatively to the previous paragraph: Under 47 U.S.C. § 227 (b) (3) and 47 U.S.C. § 227 (c) (5), Plaintiff seeks from Defendants the sum of the damages arising from Counts 1 and 2, for a total of $57,000. Plaintiff further requests that the Court treble these damages, which would be right and

proper due to Defendants' willful and knowing conduct in violation of the law. The trebled damages total $171,000.

248.   Alternatively to the previous two paragraphs: Under common law, Plaintiff seeks the damages in Count 4 from Roomster, totaling $57,000.

249.   Plaintiff seeks reimbursement by Defendants for any costs incurred in this case.

250.   If Plaintiff's claims under RICO are upheld, Plaintiff seeks reimbursement by Defendants for any attorney's fees incurred in this case.

251.   Plaintiff seeks any additional remedies the Court deems just and reasonable.

## JURY TRIAL

252.   Pursuant to the 7th amendment to the US Constitution, Plaintiff requests a trial by jury.

Jan 21, 2020

## ADDENDUM

Alexander von Brandenfels